Tsukasa Kiyono v. Commissioner. Tsukasa Kiyono and Tomoe Kiyono, Husband and Wife v. Commissioner.
Kiyono v. Commissioner
Docket Nos. 102017, 102246, 102607, 110947.
United States Tax Court
1949 Tax Ct. Memo LEXIS 46; 8 T.C.M. (CCH) 935; T.C.M. (RIA) 49252; October 17, 1949
*46 Robert Ash, Esq., and Carl F. Bauersfeld, Esq., for the petitioners. Frank M. Thompson, Jr., Esq., and S. Earl Heilman, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The respondent determined income tax deficiencies and fraud penalties for the years 1929 to 1940, inclusive, as follows: Alleged
Year
Deficiency
50% Penalty
Docket No. 102607
1929
$ 3,883.23
$ 1,941.62
1930
2,828.54
1,414.27
1931
1,168.26
584.13
1932
3,666.99
1,833.50
1933
172.79
86.40
1934
1,372.47
696.74
1935
6,883.47
3,581.60
Docket No. 102017
1936
21,969.98
10,984.99
Docket No. 102246
1937
31,233.75
15,616.87
1938
25.677.33
12,838.67
Docket No. 110947
1939
19,606.19
1940
17,755.55 The income tax liabilities, as well as the fraud penalties, are in issue for the years 1929 to 1938, inclusive. No penalties are involved for 1939 and 1940. The principal question in issue in those years is whether the petitioners were partners in the nursery business. That issue pertains to all of the years 1936 to 1940, inclusive. It is conceded that in the absence of fraud the deficiencies for the years *47 1929 to 1935, inclusive, are barred by the statute of limitations. Certain facts have been stipulated and are so found. Findings of Fact The petitioners are husband and wife and are residents of Mobile, Alabama. They filed income tax returns for the years involved with the collector for the district of Alabama. Tsukasa Kiyono, hereinafter referred to as the petitioner, is a Japanese citizen born in Okaykma, Japan. He immigrated to this country in 1907 when he was 19 years of age. He intended to study agriculture and start a rice farm in Texas, but the plan did not materialize. He never attended any public school or college in this country but took private English lessons for several years. His father was a wealthy man and kept him supplied with funds until he became self-supporting. In about 1910 the petitioner purchased a tract of land near League City, Texas, on which he planted an orchard of satsumas. In 1914, before the trees reached bearing age, they were all killed by a freeze. The petitioner then purchased another tract of land of about 40 acres near Mobile, Alabama, where there was less danger of a frost. He planted satsumas and pecans on this tract and also started a *48 small nursery. In 1914 or 1915 the petitioner married an American woman, from whom he was divorced within a few years. He returned to Japan for a visit in 1921 and was then married to Tomoe Kiyono. He and his wife returned to this country near the end of 1921 or early in 1922 and lived continuously in Alabama until, and throughout, the taxable years here involved. They desired to become citizens of the United States but, being Asiatics, were barred under our naturalization laws. They have two Americanborn daughters who are citizens of this country; one born in 1926 and the other in 1928. At the time of his marriage to Tomoe Kiyono the petitioner's total wealth consisted of the tract of land in Alabama, an old Maxwell automobile, a pair of mules, a few farm implements and a small amount of nursery stock. The house located on the Alabama tract, in which he and his wife took up their residence, was in poor condition and had no modern conveniences. At the time of her marriage to the petitioner, Tomoe Kiyono's father gave her a dowry of 4,000 yen, which at that time was equivalent to about $2,000 in American money. She earned about $1,000 from the sale of chickens and flowers which *49 she herself raised during the first few years after her marriage. This money, together with her dowry, was all invested in the nursery business. A portion of it was used to purchase an 80 acre tract of land located about two miles from their original 40 acre tract and the balance in improvements. Title to the land was taken in the name of Tsukasa Kiyono. The nursery business was begun on a small scale. Most of the work in the early years was done by the petitioner and his wife. They worked long hours together in the fields and sheds. Sometimes they worked late at night making cuttings and doing other inside jobs. They had only one part-time employee, who helped them with the manual labor. From the beginning petitioner's wife was anxious for them to try raising azaleas and camellias. She had seen many beautiful camellia and azalea gardens in Japan and thought that they could be raised successfully in this country. The petitioner at first opposed the idea, because at that time there was not much market for ornamental shrubs in their locality but later, on his wife's insistence, he agreed to try it. This later developed into their most profitable line of business. The petitioners *50 were pioneers in this field and aided in establishing the popularity of these shrubs. During the depression of the late 1920's and early 1930's the petitioners worked ceaselessly making azalea and camellia cuttings and growing new plants; so that they had a large supply of stock to meet the demand which developed for ornamental shrubs in the middle 1930's. On January 11, 1936, the petitioner and his wife executed the following agreement: "This agreement between T. KIYONO and TOMOE KIYONO, his wife, WITNESSETH: - "That in consideration of the sum of THREE THOUSAND DOLLARS heretofore, on to-wit, January 1, 1922, contributed by the said Tomoe Kiyono to the expenses of the nursery business of the undersigned, T. Kiyono, then conducted at Semmes in Mobile County, Alabamma and in further consideration of the services, advice, and assistance of the said Tomoe Kiyono to the undersigned T. Kiyono constantly rendered since that time by the said Tomoe Kiyono in the operation and conduct of said business, and in recognition of the value of said financial help and personal services, I do hereby sell, and convey, and deliver the said Tomoe Kiyono an undivided one-third interest in said nursery *51 business; it being understood and agreed that said interest so conveyed on and after the date hereof not only makes the said Tomoe Kiyono entitled to share in said proposition all proceeds, if any, arising from the future operation of said business, but shall likewise make her liable on and after the date hereof for any losses, if any, sustained by said business, in the same ratio. "It is distinctly understood that this agreement and conveyance shall take effect as of January 1st, 1936 and that on and after said date the said Tomoe Kiyono shall be responsible for the making and filing of Income Tax Returns to the United States of America, based upon this agreement of co-partnership and in proportion to the interest so conveyed to her, unless hereafter increased or reduced by mutual agreement. "IN WITNESS WHEREOF we have hereto set our hands and seals in duplicate this 11th day of January, 1936." The above agreement was drawn up by the petitioner's attorney from information furnished him by the petitioner. Thereafter, the business was operated under the firm name of "Kiyono Nurseries." There was no substantial change in the operation of the business after the execution of the *52 partnership agreement. Both the petitioner and his wife continued to perform about the same services as before. They both took an active part in the business throughout the taxable years involved. When the petitioner was away, sometimes for a week or more, his wife would supervise the employees, make bank deposits, pay the expenses, and manage the business generally. She was authorized to, and did, draw funds from the banks under her own signature. She and the petitioner always discussed and agreed upon all matters that seriously affected the business. They had always worked together and had regarded the business as a joint enterprise. Both the petitioner and his wife did less of the manual labor as the business grew and prospered. The petitioner's time was more taken up with management duties while his wife spent more of her time looking after the display plants around the house and office and training the help for jobs that required skill and a knowledge of the nursery business. Petitioner's wife contributed substantially to the success of the nursery business. All banking transactions were conducted in the name of Tsukasa Kiyono until early in 1939 when an account was opened at *53 the Merchants National Bank in the name of Kiyono Nurseries. Petitioner's wife was authorized to draw on this account and often did so. Prior to November 6, 1937, all checks received from sales of nursery stock were endorsed for deposit by or for "T. Kiyono". Thereafter they were endorsed with the stamp "Kiyono Nurseries, T. Kiyono". Advertising matter for the nursery in "Florist's Review" was carried in the name of "T. Kiyono" until the fall of 1937 when it was changed to "Kiyono Nurseries". In "The Florists Exchange and Horticultural Trade World" the name was changed to "Kiyono Nurseries" in October 1938. The liability and compensation insurance policy of the nursery business was originally taken out in the name of "T. Kiyono" but by endorsement made June 15, 1939, the name was changed to "Tsukasa Kiyono and Tomoe Kiyono, doing business as Kiyono Nurseries". During or soon after 1936 the nursery catalogues and letterheads were also changed to Kiyono Nurseries; except that some of the old letterheads were still used to avoid waste. The petitioners intended to and did operate their nursery business as a bona fide partnership during the taxable years 1936 to 1940, inclusive. *54 Kiyono Nurseries sold its stock mostly at wholesale to florists and other nurseries. The orders for plants usually came by mail through the post office at Semmes, Alabama, and were delivered by the rural mail carrier about 11 a.m. each day. The petitioner made every effort to have the orders filled the same day that they were received. That was one of the many jobs that he looked after personally. He would prepare each day a "digging list" for each department and see that the plants were dug and ready for shipment on the next train, either late that afternoon or early next morning. Different types of plants were grown in different locations of the nursery, some on the original 40 acre tract and some on the 80 acre tract two miles distant. A separate list had to be prepared for each of the three foremen in charge of the different divisions. This entailed considerable work and often deprived the petitioner of his lunch hour. As a matter of convenience some of the expenses of the nursery, both for supplies and wages, were paid in cash on the premises. These expenditures, sometimes, were not entered in petitioner's books. The parties have so stipulated as to a number of such items, *55 as hereinafter shown. No standard set of books or records was kept for the nursery business. There was a cash book in which all of the cash orders were entered as they were received. The expenses were entered on the opposite page. Charge account orders were set aside, temporarily, to be entered in the cash book after they were verified with the charge account records. Many of these charge account orders were never entered in the cash book and were not reflected in petitioners' income tax returns. In 1938 the petitioner changed this practice and began entering in the cash book all of the orders, both cash and charge, as they were received. The books were poorly kept and contained many inaccuracies. Most of the entries were made by the petitioner personally. In his absence they were made by one of the employees who served as his assistant at times. The petitioner had had no training or previous experience in bookkeeping. All checks and cash receipts, except small amounts of cash used for current incidental expenses, were deposited in accounts maintained at local banks. All money orders were cashed at the post office by the petitioner or his wife or the mail carrier. They were cashed *56 at the post office to avoid the fee the banks charged for cashing them. Prior to and during 1936 the petitioner maintained a trade account in his own name with Fenner & Beane, New Orleans. On July 24, 1936, an account was opened with the same brokers in the name of Tomoe Kiyono and stock certificates representing 1,520 shares of 11 different stocks were transferred to her account from petitioner's account. Thereafter, the petitioner handled the account under a power of attorney. The petitioner did a considerable amount of traveling each year, visiting other nurseries in this country and abroad to acquire new stock and to study the methods used by other nurseries. He made trips to Japan in 1930 and 1935. In 1931 he made a trip to Europe, visiting England, Holland, Belgium, France, Switzerland and Germany. He made a similar trip in 1938 with his wife and daughters. On these trips the petitioner visited many nurseries and acquired new varieties of plants which he imported to this country for propagation. He kept no account of the costs of these trips and claimed no deduction for traveling expenses in his returns for the years 1929 to 1937, inclusive. However, a deduction of $100 a *57 month was claimed for traveling expenses in a partnership return filed for 1938. The petitioner and his wife made a visit to Japan in 1939. The petitioner returned to this country in 1940 and his wife in 1947. The petitioner submitted a financial statement to the Merchants National Bank, Mobile, Alabama, on May 1, 1928, in which he reported that he owned securities and mortgages of a face value in excess of $50,000 and that his nursery business had a value of not less than $100,000. On March 27, 1935, he submitted a financial statement to Dun & Bradstreet, showing a tangible net worth of $325,000 at January 26, 1934, and $354,000 at March 27, 1935. The petitioner filed his first income tax return for the year 1924. The return showed no tax liability. For the years 1925 to 1928, inclusive, he filed individual returns showing taxes due in the respective amounts of $39.61, $95,54, $190.35 and $75.27. For the years 1929 to 1935, inclusive, the petitioner and his wife filed joint returns showing the following amounts of net income and tax liability: Year
Taxpayer
Net Income
Tax Liability
1929
T. Kiyono
$11,750.11
$ 105.62
1930
T. Kiyono
11,333.29
129.31
1931
T. Kiyono
10,855.81
91.75
1932
T. Kiyono
1,801.44
None
1933
T. Kiyono & Wife
559.21
None
1934
T. Kiyono
7,026.74
22.47
1935
T. Kiyono
19,199.52
1,343.52
*58 The returns for those years were made by deputy collectors on information furnished them by the petitioner. Partnership returns were filed in the name of Kiyono Nurseries for the years 1936 to 1940, inclusive. For those years the petitioners filed individual returns in which they each reported their pro rata share of the partnership earnings, in accordance with the partnership agreement of January 11, 1936. The partnership returns showed the following amounts of net income: Year
Net Income
1936
$ 33,279.13
1937
48,110.58
1938
100,641.97
1939
103,469.07
1940
88,695.41 The partnership returns and petitioners' individual returns for the years 1936 to 1940, inclusive, were prepared by a certified public accountant. In making the partnership returns he used the figures shown in the cash receipts and disbursements books kept for the nursery business. The petitioners' individual returns for the years 1936 to 1940, inclusive, showed net income as follows: T. Kiyono
Tomoe Kiyono
Year
Net Income
Tax Liability
Net Income
Tax Liability
1936
$26,921.60
$ 2,762.79
$12,853.04
$1,101.36
1937
38,194.58
5,357.98
18,001.21
1,707.38
1938
63,239.63
13,416.75
31,462.37
4,509.51
1939
64,543.12
13,884.38
32,432.06
4,740.42
1940
56,259.62
17,566.24
28,278.26
5,754.06
*59 An examination of the petitioners' returns for 1934 and 1935 was made by revenue agents in 1936. A report for 1934 was submitted May 20, 1936, showing an additional tax liability of $581.30 for that year. On November 10, 1936, another report was submitted showing an overpayment of $560.29 for 1934 and an additional tax liability of $155.42 for 1935. During 1939 a revenue agent began an examination of petitioners' returns for 1936, 1937 and 1938. He discovered that the returns for those years of the income from the nursery business were substantially in accordance with the books and records of the business, insofar as they were made available. The books for the years prior to 1936 had been lost or destroyed. At the suggestion of an "informer" to look for hidden income the agent checked the records of the post office for money orders and also checked the bank deposits. He found that substantially all of the money orders had been reported in the returns, but that the total bank deposits were far in excess of the reported income. At this point a special agent was brought into the case and the examination was extended to all of the years 1929 to 1938, inclusive. After an investigation *60 extending over a year, the agents submitted reports on which the deficiencies and fraud penalties shown above were based. The respondent made jeopardy assessments of the deficiencies and penalties so determined and in 1943 seized and sold securities of the petitioner in satisfaction thereof. In these reports, income was determined under the so-called "bank deposit" method. All bank deposits were treated as income unless it was clearly shown that they were not. To these bank deposits the agents added $600 each year, representing estimated living expenses of the petitioner and his family, and also the following amounts representing payroll and miscellaneous expenses for which no canceled checks could be found and which were presumed to have been paid out of undeposited cash sales: 1929
$2,884.21
1930
3,012.37
1931
1,714.61
1932
1,924.31
1933
663.74
1934
1,456.24
1935
2,191.60
1936
4,066.07
1937
2,621.95
1938
2,217.11
The investigation disclosed that the petitioners had failed to enter in their books or to report in their returns many items of income as well as items of deductible expenses. The parties have agreed on a number of such items, as set *61 out in the stipulation of facts referred to above. It is further stipulated that for the years 1936, 1937 and 1938, there were a number of bank deposits of proceeds from the sale of nursery stock which were not entered in the cash receipts and disbursements book and, consequently, were not reflected in petitioners' income tax returns. There were 29 of such items in 1936, totaling $20,172.23; 43 in 1937, totaling $22,008.92, and 4 in 1938, totaling $1,416.81. All of these amounts represented proceeds of sales of nursery stock to "charge account" customers which were not entered in the cash receipts and disbursements book from which the returns were prepared. The 1938 omissions include an item of $1,200, which had first been entered in the cash book but had later been canceled out by the petitioner after he had brought suit to collect the account. It is further stipulated that for the year 1933 the petitioner realized gains from trading in commodities in the amount of $6,360.25, which were not reported in his return for that year. It is further stipulated that for 1935 the petitioner reported net capital gains of $7,221.30, whereas the correct amount of net capital gains for that *62 year was $13,760.41. The unreported capital gains represented profits on trading in securities. It is further stipulated that the net income for 1929, as determined in the deficiency notice, should be reduced as follows: (1) $3,000.00 deposit of May 28, 1929 in the First National Bank of Mobile represents a loan and is not income. (2) $500.00 deposit of June 25, 1929 in the First National Bank of Mobile represents a loan and is not income. (3) $9,268.50 deposit of June 28, 1929 in the First National Bank of Mobile represents the sale of 100 shares of Missouri Pacific Railway stock at $93.00 per share, less a commission and tax of $31.50. This is not ordinary income, however, petitioners realized a capital gain on this transaction in the amount of $1,416.00. (4) $1,000.00 opening deposit in the American Trust Company of Mobile on July 23, 1929 represents a transfer of funds from the First National Bank of Mobile and is not income. (5) $3,120.00 deposit of August 5, 1929 in the American Trust Company of Mobile is the proceeds of the J. V. Smith mortgage of $3,000.00, plus interest of $120.00. $3,000.00 of said deposit is not income to petitioners. (5 1/2) $99.52 deposit *63 of April 27, 1929 in the First National Bank to Mobile represents the proceeds from the sale of a liberty bond and is not income. (6) $3,300.00 deposit of September 24, 1929 in the American Trust Company of Mobile represents the proceeds of a loan and is not income to petitioners. (7) $6,402.50 deposit of November 5, 1929 in the American Trust Company of Mobile represents the net amount of a loan of $6,500.00 and is not income to the petitioners. It is further stipulated that the deficiencies for the years 1930 to 1936, inclusive, should be reduced in varying amounts by similar adjustments. The following tabulation shows the petitioner's net income as reported in his returns, the net income as determined in the deficiency notices, and the reductions in income to be made under the stipulation of facts: Determined in
Stipulated
Year
Reported
Deficiency Notice
Reduction
1929
$11,750.11
$46,457.97
$26,570.52
1930
11,333.29
37,721.45
13,978.77
1931
10,858.81
25,186.53
3,648.60
1932
1,801.44
31,840.89
25,565.09
1933
559.21
8,783.10
2,150.00
1934
7,026.74
20,119.87
223.75
1935
19,199.52
50,050.99
377.06
1936 *
26,291.60
87,279.58
2,329.08
*64 It is further stipulated that an additional reduction should be made in 1938 income, as determined in the deficiency notice, of $3,730.69, representing a transfer of funds from one bank account to another. The respondent concedes in his brief, on the basis of evidence adduced at the hearing that the petitioner is entitled to the reduction of other miscellaneous items totaling $130.21 in 1936; $184.43 in 1937, and $25 in 1938. It is further stipulated that for the years 1936 to 1938, inclusive, there were certain items of expenses which were not entered in the books and records of Kiyono Nurseries or deducted in the partnership returns or petitioners' individual returns for those years, but which the respondent has allowed in determining the deficiencies herein. There are 13 of such items for 1936, totaling $269.99; 38 for 1937, totaling $1,455.81, and 18 for 1938, totaling $477.62. These were mostly small items ranging in amounts from less than one dollar to several *65 hundred dollars. Many of the petitioner's customers came for nursery stock in their own trucks and paid the petitioner in cash or by check. Sometimes the checks would exceed the amount of the purchases and petitioner would pay the customer the difference in cash. The checks would then be deposited, with the result that the deposits would show amounts larger than actual sales. At times the petitioner could not fill a customer's entire order but would deposit the customer's check and issue his own check for the difference. In this manner the bank deposits sometimes showed receipts in excess of actual sales. The petitioners' returns for the years 1929 to 1938, inclusive, were not false or fraudulent with intent to evade tax. Opinion LEMIRE, Judge: On the fraud issue the burden of proof rests upon the respondent by statute. Sec. 1112, I.R.C. To sustain his determination of fraud the respondent must show by convincing evidence not only that the petitioner underestimated his income in his returns but that he did so with the intent to evade taxes. M. Rea Gano, 19 B.T.A. 518; A. W. Mellon, 36 B.T.A. 977. There is no doubt that *66 the petitioner failed to report substantial amounts of his income in some of the years involved, and the parties have so stipulated. For instance, in the partnership returns and in petitioner's individual returns there are omissions of bank deposits from the nursery business amounting to approximately $20,000 in 1936 and $22,000 in 1937. These amounts represented the proceeds of sales made to charge account, as distinguished from cash, customers. These charge account sales were not entered in the cash books, as were the cash sales from which the returns for the years were prepared by a certified public accountant. Other omissions are recounted in the stipulation of facts. There was an omission in 1933 of a profit of $6,360.25 from a commodity trading account and an understatement of $6,539.11 in capital gains from trading in securities in 1935. There is evidence, too, that petitioner's increase in net worth over the period 1929 to 1940 was considerably in excess of the net income reported in his returns for those years. However, we are not convinced that there was any preconceived plan or intent on petitioner's part to defraud the Government of taxes. There is no evidence to *67 that effect in the record before us. It must be borne in mind that the petitioner is an immigrant who came to this country after reaching maturity. Being an Asiatic, he was denied citizenship under our naturalization laws. He was a member of the Rotary Club and the Chamber of Commerce of Mobile. His reputation for honesty and integrity among his employees, his customers, and his associates was excellent. Many of his tax difficulties are traceable to his unfamiliarity with our business customs and income tax laws. Such books and records as he kept were inaccurate as well as inadequate. He undertook to do most of the bookkeeping himself, in addition to managing the business and performing much of the manual labor. He was much more concerned with the production and distribution of plants than with keeping the records of his operations. Petitioner's explanation of the omissions from his cash book and his income tax returns of the large amount of charge account sales in 1936, 1937 and 1938, is that under the pressure of business he negligently failed to post these receipts in the cash book. While this explanation may not be sufficient to absolve him of all culpability, it does, with *68 the other evidence of record, leave in our minds a doubt that the omissions were deliberate and with fraudulent intent. This might also be said of the omissions of the gains from transactions in the securities and commodities markets. The petitioner testified that he did not report these gains because he had unrealized losses which he thought could be offset against them. Petitioner's disavowal of any fraudulent intent is all the more plausible when it is borne in mind that in some, or all, of the taxable years involved he omitted from his records and from his returns many deductible items that would have served to reduce his income. The petitioner was handicapped in his production of evidence as to these items because of the remoteness of some of the taxable years involved, which go back to 1929. The investigating revenue agents themselves were unable to find any supporting data for many of their conclusions. All of petitioner's property and some of his books and records were seized by the Alien Property Custodian in 1942. The books and records were unavailable as evidence in this proceeding. The nursery property was later advertised and sold. It is our belief, based on the *69 evidence before us, that petitioner's returns for the taxable years 1929 to 1938, inclusive, were not false or fraudulent with intent to evade taxes. The deficiencies determined for the years 1929 to 1935, inclusive, are therefore barred by the statute of limitations. Large portions of the deficiencies determined for 1936, 1937 and 1938, and all of those for 1939 and 1940 result from the respondent's refusal to recognize the petitioners as partners in the nursery business in those years. We have found on the evidence that the petitioners conducted the nursery business as a valid partnership after 1935, in accordance with the agreement which they executed on January 11, 1936. The petitioner's wife contributed substantial capital of her own to the business and rendered valuable services, especially in the years of its development. She continued her services to a lesser extent throughout the taxable years involved. She shared in the management and control of the business as well as in the disposition of the profits. On the evidence before us, we are satisfied that the petitioners intended to and did operate the nursery business as a genuine partnership, in accordance with the partnership *70 agreement referred to above. The parties have stipulated, or agreed in their briefs, as to the treatment of certain specific items as set out in the above findings and the agreements will be given effect under a Rule 50 computation. In all other respects the respondent's determination is sustained. Decisions will be entered under Rule 50. Footnotes
*. Partnership returns were filed in the name of Kiyono Nurseries for 1936 and the petitioner reported only his share of partnership income. The respondent's determination includes all of the nursery income.↩